UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| KYLE SOLTESZ, D/B/A<br>TOP DOG ENTERPRISES, | ) | CIV. 11-5012-JLV |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| RUSHMORE PLAZA CIVIC CENTER,<br>a political subdivision of the City of<br>Rapid City, and CITY OF RAPID CITY,<br>a political subdivision of the State of<br>South Dakota, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## INTRODUCTION

This matter is before the court on plaintiff Kyle Soltesz's complaint alleging a violation of his constitutional rights and seeking damages therefor pursuant to 42 U.S.C. § 1983.  See Docket No. 1.  Mr. Soltesz also asserts state law claims of breach of lease, conversion, and tortious interference with business relations.  Id.  Jurisdiction is premised on the presence of a federal question, 28 U.S.C. § 1331, and the deprivation of a civil right, 28 U.S.C. § 1343.  Mr. Soltesz has filed a motion for partial summary judgment as to defendants' liability on the § 1983 claim, the breach of lease claim, and the conversion claim.  See Docket No. 13.  The district court, the Honorable Jeffrey L. Viken, referred this motion to this magistrate judge for a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

# FACTS

The facts pertinent to Mr. Soltesz's motion are as follows.  "Top Dog" is a
fictitious name for a business owned by both Mr. Soltesz and his mother, Tana
Soltesz.  See Docket No. 31-9; Docket No. 31-3, pages 2-4 (depo. pages 7-8, 36-
37); page 18 (depo. pages 149-50).  On October 7, 2009, the Civic Center
entered into a five-year contract for the operation of a pizza concession at the
Rushmore Place Civic Center ("Civic Center").  See Docket No. 1-1.

The contract refers to "lessee" throughout the document.  Id.  On the
front page of the agreement, the handwritten words "Top Dog" appear.  Id.
There are numerous hand-written changes to the agreement, all of which bear
Mr. Soltesz's initials.  Id.  At the end of the agreement is the signature
"K. Soltesz" and the identification "lessee."  Id.  Mr. Soltesz's signature does not
state affirmatively that he is signing on behalf of "Top Dog" as an agent of that
entity.  Id.  Tana Soltesz's signature does not appear anywhere on the
agreement.  Id.   Had the contract run its natural course, it would have
concluded on October 7, 2014.  Id.

Under the terms of the contract, the Civic Center could terminate the
contract by giving the lessee written notice 45 days in advance of the
termination.  Id.  If the contract were terminated, the lessee was to have 90
days to remove his equipment from the food court once the 45-day notice was

2

given.  Id.  Part of the lessee's equipment at the Civic Center was a pizza oven, which was cemented into place.

On February 3, 2011, during the annual Stock Show event held at the Civic Center, a physical altercation occurred between Mr. Soltesz and his employee, Adam Erickson, on the grounds of the Civic Center.  The event is partially captured on video, but the characterization of the event is not agreed upon by the parties.  The Civic Center accuses Mr. Soltesz of a criminal assault.

Mr. Soltesz denies that he committed a criminal act, asserting that Adam pushed him first and that Mr. Soltesz's reaction was merely defensive.  See Docket No. 31-3, pages 3 and 5 (deposition pages 34-37 and 82-83).  Although Mr. Soltesz was on probation in state court at the time, and although a video of the altercation was provided to his probation officer, no criminal charges or revocation of probation proceedings were brought against Mr. Soltesz.  See Docket No. 31-3, page 12 (depo. pages 117-18).

Defendants submitted a video recording of the event, but the interaction between Mr. Soltesz and Adam immediately before Mr. Soltesz's attack are not within view of the camera.  See Docket No. 31-8.  The video shows that the events depicted therein occurred at a few minutes before 1:00 pm on February 3, 2011.  Id.  Over seven hours later, Mr. Soltesz was summoned to a meeting with Civic Center manager Brian Maliske at the close of business on February

3

3, 2011, and confronted about the assault.  Mr. Soltesz made no response to the accusations.  A Rapid City Police Officer present at the meeting with Maliske issued Mr. Soltesz a notice of no trespass at 20:30 pm (8:30 p.m.).  See Docket No. 31-1.  Maliske told Mr. Soltesz that he would not be allowed to re-enter Civic Center property except upon certain conditions.

On February 8, 2011, the Civic Center terminated Mr. Soltesz's contract. See Docket No. 1-2.  In its February 8, 2011, letter the Civic Center listed a variety of other acts by Mr. Soltesz in addition to the assault that it asserted were breaches of the contract, including the use of offensive and abusive language in the pizza concession and on Civic Center premises, the use of offensive and abusive behavior, parking in the fire lanes, failing to follow Civic Center procedures for logging into the building and wearing designated identification, selling and advertising unauthorized products at the concession, being tardy in opening his concession, and failing to have proof of insurance.[1] Id.

Although Mr. Soltesz was given a notice of trespass, the Civic Center offered to waive the trespass notice if Mr. Soltesz paid the Civic Center within 20 days the amounts due to the Civic Center under its lease with Mr. Soltesz.

---

[1]The lease required Mr. Soltesz to obtain worker's compensation insurance at the minimum statutory limits, commercial general liability coverage, and occurrence base coverage.  The commercial general liability policy of insurance was to list the Civic Center as an additional insured.  See Docket No. 1-1, ¶ II.

4

Id. After Mr. Soltesz satisfied this prerequisite, the Civic Center stated that it would allow him to make an appointment so that he could retrieve his equipment from the premises. Id.

The Stock Show ended in 2011 on February 5, 2011. In between the oral advisement to Mr. Soltesz on Feburary 3, 2011, and the end of the Stock Show, Top Dog continued to operate its pizza concession through Mr. Soltesz's mother, Tana Soltesz, and various managers who were employed by Top Dog.

Between February 8, 2011, and April 26, 2011, Mr. Soltesz engaged in negotiations with a third party to transfer Mr. Soltesz's interests under the Civic Center contract and to transfer his pizza equipment. Defendants were aware of these negotiations and indicated that they would approve the transfer of the leasehold interest to the third party. Defendants assert that these negotiations obviated the need for Mr. Soltesz to remove his equipment from the Civic Center because, if the transfer to the third party took place, he could simply leave the equipment in place at the Civic Center. Mr. Soltesz testified at his deposition in this matter that, during his negotiations with the third party, he believed he had a continuing interest in the leasehold at the Civic Center.

Also during this time, Mr. Soltesz made arrangements with the Civic Center to retrieve perishable inventory from his concession stand and he was allowed to remove some of these items, although some of the perishable items did end up getting ruined. See Docket No. 31-3, pages 7, 13 (depo. pages 93-

96, 125-27).  When Mr. Soltesz's negotiations with the third party fell through on or about April 26, 2011, Mr. Soltesz made arrangements with the Civic Center to retrieve his equipment and did effectuate that removal within approximately one week.

Mr. Soltesz filed his complaint in this matter on February 22, 2011, after receiving the February 8, 2011, letter from defendants and prior to the remaining allegations in the complaint.  In his complaint, he asserts claims against defendant for breach of lease, conversion, tortious interference with business relations, and violation of his constitutional rights under color of state law.  Defendants answered and counterclaimed, alleging that Mr. Soltesz breached the contract and committed fraud and deceit.  Defendants seek both damages and the remedy of rescission on their counterclaim.

Mr. Soltesz now moves for partial summary judgment on three of his four claims as to defendants' liability on those claims.  The claims for which Mr. Soltesz seeks a determination of defendants' liability as a matter of law are: (1) breach of contract; (2) conversion; and (3) violation of Mr. Soltesz's constitutional rights under color of state law.

Defendants oppose Mr. Soltesz's motion.  They assert that the contract entered into between the parties was a license agreement, not a lease, and thus not subject to forcible entry and detainer laws.  They suggest that Mr. Soltesz believed he had a continued leasehold interest even after receiving defendants'

6

February 8, 2011, letter.  And they suggest that Mr. Soltesz could have retrieved his property sooner than May, 2011, and that he did not do so because of his pending negotiations with the third party which, had they been successful, would have allowed him to leave his equipment where it was.

## DISCUSSION

### A.    Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, a movant is entitled to summary judgment if the movant can "show that there is no genuine issue as to any material fact and that [the movant] is entitled to judgment as a matter of law."  In determining whether summary judgment should issue, the court views the facts, and inferences from those facts, in the light most favorable to the nonmoving party.  See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).  The burden is placed on the moving party to establish both the absence of any genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).

Once the movant has met its burden, the nonmoving party may not simply rest on the allegations in the pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); FED. R. CIV. P. 56(e)(each party must properly support its own assertions of fact and properly address the opposing party's assertions of fact, as required by Rule

56(c)).  In determining whether a genuine issue of material fact exists, the court views the evidence presented in light of which party has the burden of proof under the underlying substantive law.  Id.  Summary judgment will not lie if there is a genuine dispute as to a material fact, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

The substantive law identifies which facts are "material" for purposes of a motion for summary judgment.  Anderson, 477 U.S. at 247.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  Id. at 248 (citing 10A C. Wright, A. Miller, & M. Kane, FEDERAL PRACTICE AND PROCEDURE § 2725, pp. 93-95 (1983)).  The Supreme Court has further explained that:

> the issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved *conclusively* in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.

Anderson, 477 U.S. at 248-49 (quoting First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 288-89 (1968)(emphasis added)).  Essentially, the availability of summary judgment turns on whether a proper jury question is presented.  See Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).  "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial-whether, in other words, there are any genuine factual issues

8

that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250.

**B.   Breach of Contract**

Mr. Soltesz characterizes the agreement he held with the Civic Center to be a "lease." Defendants assert that it is in fact a "license" only. Both agree, however, that the agreement constitutes a contract. For purposes of determining whether defendants have breached the agreement as a matter of law, the court will speak of the agreement as a "contract" for this section of the opinion.[2] Under South Dakota law, both a license agreement and a lease agreement respecting real property are contracts. See Thunderstick Lodge, Inc. v. Reuer, 1998 SD 110, ¶ 25, 585 N.W.2d 819, 824; City of Watertown v. Dakota, Minnesota, & Easter RR, 1996 S.D. 82, ¶ 11, 551 N.W.2d 571, 574.

Here, both parties assert legal claims against the other for breach of the agreement. Defendants assert that Mr. Soltesz breached the agreement by physically assaulting his employee at the Civic Center during a public event.[3]

_____

[2]The court notes that it has jurisdiction over Mr. Soltesz's state law claims of breach of contract, conversion, and tortious interference with business relationships under 28 U.S.C. § 1367, granting district courts supplemental jurisdiction over claims which are part of the same case or controversy as the federal question claim.

[3]Defendants assert that Mr. Soltesz breached the contract in numerous ways, but the most serious breach alleged and the one that precipitated the issuance of the notice of trespass was Mr. Soltesz's alleged assault upon his employee. Defendants assert that this was a violation of a term of the parties' contract requiring all "personnel" of Mr. Soltesz to "observe all applicable

9

Mr. Soltesz asserts that defendants breached the agreement by failing to give Mr. Soltesz 45 days notice prior to termination under the contract.

Defendants do not dispute that they never gave Mr. Soltesz 45-days notice prior to terminating the contract.  Under South Dakota law, which governs Mr. Soltesz's breach of contract claim, "[i]t is well established that a material breach of a contract excuses the non-breaching party from further performance." FB & I Bldg. Products, Inc. v. Superior Truss & Components, 2007 SD 13, ¶ 15, 727 N.W.2d 474, 478.  However, if the breach was not material, then the non-breaching party would not be excused from further performance under the contract, and would be limited to seeking damages as the remedy for a nonmaterial breach.  Miller v. Mills Const., Inc., 352 F.3d 1166, 1171-72 (8th Cir. 2003); Thunderstik Lodge, Inc., 1998 SD 110, ¶¶ 25-26, 585 N.W.2d at 824.  Under South Dakota law, a material breach is a breach that "defeat[s] the very object of the contract." Icehouse, Inc. v. Geissler, 2001 SD 134, ¶ 20, 636 N.W.2d 459, 465 (quoting Thunderstik Lodge, Inc., 1998 SD 110, ¶ 25, 585 N.W.2d at 825).

In response to Mr. Soltesz's complaint alleging, *inter alia*, breach of contract, defendants responded in their answer that Mr. Soltesz himself violated the terms of the contract.  See Docket No. 8, Answer at ¶¶ 11, 15-17;

---

regulations including the Rushmore Plaza Civic Center Employee Code of Conduct."  Defendants assert that workplace violence is a violation of this provision of the contract.

10

Counterclaim at ¶¶ 1-12.  Therefore, if Mr. Soltesz did breach the contract, and if his breach of the contract was material, defendants may have been excused from further performance under the contract, including the giving of the 45-day notice prior to termination of the contract.[4]  FB & I Bldg. Products, Inc., 2007 SD 13, ¶ 15, 727 N.W.2d at 478.  Whether a breach of contract is "material" is a question of fact for the jury to determine.  Miller, 352 F.3d at 1172.

Neither party addresses the issue of who the real party in interest was in the contract.  Was it "Top Dog," or was it Mr. Soltesz personally?  The contract is somewhat ambiguous on this point.  Mr. Soltesz signed as "lessee," but the question remains whether the "lessee" was "Top Dog" or Mr. Soltesz personally. "Top Dog" was not an organized business entity like an LLC or a corporation, but Mr. Soltesz admits that his mother was a co-owner.  Even without the formalities of a written business agreement, at a minimum Mr. Soltesz and his mother would be common law partners in the business known as "Top Dog." See SDCL ch. 48-7A.

The court mentions this ambiguity because it may bear on the question of the materiality of the breach of the contract, if any, by Mr. Soltesz.  If the contract was really with "Top Dog" and a partner of "Top Dog" never breached

---

[4]The fact, if it is eventually proven, that Mr. Soltesz's actions in regard to his employee constituted a criminal assault is not determinative of whether he breached the contract as a violation of law is not always considered a material breach of the contract.  See Thunderstick Lodge, Inc., 1998 SD 110, ¶ 27, 585 N.W.2d 819, 824.

the agreement and was capable of continuing to carry on the business, then the breach may not have been a material one.  If the contract were with Mr. Soltesz personally, then the breach may be of a different magnitude.

Although defendants' failure to abide by the 45-day termination notice is undisputed, the court cannot grant partial summary judgment to Mr. Soltesz on his breach of contract claim because genuine factual issues exist as to whether Mr. Soltesz breached the contract first and, if so, whether his breach was a material breach that absolved defendants from further performance under the contract.  The court recommends denying Mr. Soltesz's motion for partial summary judgment as to defendants' liability on his breach of contract claim.

**C.     Violation of Soltesz's Constitutional Rights**

Section 1983 affords a remedy for damages when a person acting under color of state law deprives another person of any federal constitutional right. City of Oklahoma City v. Tuttle, 471 U.S. 808, 816 (1985).  Mr. Soltesz alleges that defendants violated his rights under the Fourth Amendment by seizing his property illegally.  Mr. Soltesz additionally alleges that defendants violated his procedural due process rights under the Fourteenth Amendment by divesting him of his property without due process of law.  The "property" which forms the basis of both Mr. Soltesz's Fourth and Fourteenth Amendment claims are his

interest under the contract which allowed him to occupy the space at the Civic Center for his concession, and his equipment and inventory at his concession.

Mr. Soltesz argues that when state actors seize property and displace a tenant from his leasehold without resort to statutory eviction procedures, those state actors violate both the Fourth Amendment and the Fourteenth Amendment.  However, those statutory eviction procedures apply only to leases.

Defendants do not dispute that they ousted Mr. Soltesz from his concession without resort to South Dakota's statutory eviction procedures, but they assert that their agreement with Mr. Soltesz was a license agreement, not a lease agreement.  Therefore, according to defendants, the statutory eviction procedures are inapplicable.  The court, then, turns first to the question of the nature of the agreement between the Civic Center and Mr. Soltesz.

**1.     The Agreement Between the Parties Was a Lease**

The agreement in question can be found at Docket No. 1-1.  It appears to be a form contract.  Defendants admit that they drafted the contract.  See Docket No. 16-4, page 2, Answer to Interrogatory 4(a).  Throughout the contract, the Civic Center is referred to as "owner."  See Docket No. 1-1. Mr. Soltesz/Top Dog is referred to throughout the contract as the "lessee."  Id. The agreement required the lessee to obtain, among other coverages,

13

commercial general liability coverage and to list the Rushmore Plaza Civic Center as an additional insured on that policy of insurance.  Id.

Generally, the contract permitted the lessee to operate a food concession upon Civic Center premises.  Id.  The Civic Center retained control over the types of food offered and the prices.  Id.  The contract required the lessee to pay the owner 30% of gross receipts (less sales tax) per event in return for the use of the Civic Center premises by lessee.  Id.  The Civic Center retained the right to audit the lessee's business operations at any time and to control signs and advertising.  Id.

Lessee was required to assist with garbage removal and cleaning in the food court area at the Civic Center.  Id.  Lessee had to obtain the Civic Center's permission for access to the premises outside of event times if needed for preparation or cleaning.  Id.  Lessee likewise had to obtain the Civic Center's permission to store any product within the freezer or cooler facilities at the Civic Center.  Id.

The contract contains a section marked:  "Return of Premises."  In that section, the lessee agrees to "surrender possession of the Rushmore Plaza Civic Center owned premises in as good condition as the same were it [sic] received."  Id.

Plaintiff Kyle Soltesz signed the agreement in the blank at the end of the agreement marked for the "lessee."  His signature does not indicate whether he

14

was signing on behalf of Top Dog or for himself individually.  Id.  The name

"Top Dog" does not appear in any typewritten portion of the contract.  Id.  The

only place the words "Top Dog" appear are in handwriting off to the side at the

top of the first page of the agreement.  Id.  No signature other than

Mr. Soltesz's appears anywhere on the agreement on behalf of the "lessee."  Id.

When defendants filed their answer and counterclaim in this matter, they

repeatedly referred to the contract between them and Mr. Soltesz as a "lease."

See Docket No. 8.  In addition, Mr. Soltesz served defendants with

interrogatories in which he asked defendants whether the contract was a

"lease."  See Docket No. 16-4, page 2, Answer to Interrogatory 4(d).  Defendants

answered under oath that "it is a contract to lease concession space with the

Rushmore Plaza Civic Center."  Id.  Prior to providing its answers under oath to

Mr. Soltesz's interrogatories, defendants stated under oath that they had

undertaken a complete and full review of its records, documents and files

before answering the interrogatories.  See Docket No. 16-4, page 1,

Interrogatory No. 1 and Answer thereto.

Mr. Soltesz further inquired that, if the defendants denied that the

document was a lease, to state what the nature of the agreement was.  Id.

Interrogatory 4(e).  Admitting that their answer to the previous question

established the document as a lease, defendants answered interrogatory 4(e)

"NA."  Mr. Soltesz further inquired if defendants were denying that the

document was a lease, why the document used the term "lease." Id.

Interrogatory 4(f). Again, admitting that the document *was* a lease, defendants

answered this interrogatory "NA." Id. Having admitted under oath that the

document was in fact a lease, defendants now take the position in response to

plaintiff's partial summary judgment motion that the contract was a licensing

agreement and not a lease.

Defendants may not take a position in regard to the pending motion that

is contradicted by their own prior sworn testimony. Wigg v. Sioux Falls School

Dist. 49-5, 274 F. Supp. 2d 1084, 1090 (D.S.D. 2003), rev'd on other grounds,

382 F.3d 807 (8th Cir. 2004). In Wigg, the district court followed the law from

the Tenth Circuit and the Seventh Circuit holding that a party may not make a

substantive change to his prior sworn testimony unless it is to correct a

transcription error, if it is based on newly discovered evidence, or if the party

did not have access to the pertinent evidence at the time of his earlier

testimony. Id. at 1091.

Prior Eighth Circuit precedent supports the result in Wigg. In Wilson v.

Westinghouse Elec. Corp., 838 F.2d 286 (8th Cir. 1988), the plaintiff testified at

his deposition that his employer told him he was being terminated. Id. at 289.

Then, in response to a summary judgment motion, the plaintiff supplied an

affidavit that contradicted this testimony, stating that he believed his

employment would continue indefinitely. Id. Although the court cautioned

16

that district courts "must exercise extreme care not to take genuine issues of fact away from juries," nevertheless, summary judgment is proper "where a party's sudden and unexplained revision of testimony creates an issue of fact where none existed before.  Otherwise, any party could head off a summary judgment motion by supplanting previous depositions *ad hoc* with a new affidavit, and no case would ever be appropriate for summary judgment."  Id.

Here, plaintiff made the contract in question available as an attachment to his complaint when this action was first filed, so defendants clearly had access to it from the very inception of this case.  Furthermore, defendants stated under oath that, before answering plaintiff's interrogatories, they had undertaken a thorough review of all their documents and files.  Again, then, lack of access to the pertinent documents or newly discovered evidence is not the reason for defendants' attempt to change their testimony.  Finally, defendants themselves typed up their answers to plaintiff's interrogatories, so there is no third-party transcription error that can be offered up as the reason for the change.

The court need not rest on defendants' admissions alone, however, to conclude that the agreement in question is a lease.  The interpretation of a contract is a question of law for the court to determine.  Kernelburner, LLC v. MitchHart Mfg., 2009 S.D. 33, ¶ 7, 765 N.W.2d 740, 742.  Under South Dakota law, the conclusion that the agreement is a lease is likewise inescapable.

17

In Price & Baker Co. v. Madison, 17 S.D. 247, 95 N.W. 933 (1903), the plaintiff had been given the right to enter on defendant's land and to cut and remove timber from that land.  Id. at 933-34.  Because the property was a homestead, there was a legal question as to the validity of the document if it was a lease because the defendant's wife had not signed the agreement.  Id. The court avoided this legal issue however, because it determined that the agreement was a license.  Id. at 934-35.  "A license, in the law of real property, is an authority to do an act or a series of acts upon the land of the person granting the license, without, however, conferring on the licensee any estate in the land.  It does not create an easement, nor give rise to an interest in the land, . . ." Id.

By contrast, a lease is defined by South Dakota law as "a contract by which one (the lessor or landlord) gives to another (the lessee or tenant) temporary possession and use of real property for reward and the lessee agrees to return such property to the lessor at a future time."  See SDCL § 43-32-1. See also In re Nelson, 123 B.R. 993, (Bkr. D.S.D. 1991), vacated on other grounds, 143 B.R. 722 (D.S.D. 1991) (stating that "a real estate lease is a contract by which the lessor gives the lessee temporary possession and use of the property for value").

In Aegerter v. Hayes, 55 S.D. 337, 226 N.W. 345 (1929), the court construed a contract allowing one party to enter upon another party's land to

18

"well and faithfully till and farm" the land.  Id. at 346.  The court concluded
that the agreement was a lease because it recognized one party as the owner of
the realty, it contained an agreement by the other party to pay rent in the form
of a share of the crops reaped, and it stated a definite limit to the term of
occupancy by the temporary possessor to be covered by the contract.  Id. at
347.  These elements "are held to establish the relation of landlord and tenant,
and, so far as that question is concerned, the writing is a lease."  Id.

Likewise, in Dobbs v. Atlas Elevator Co., 25 S.D. 177, 126 N.W. 250
(1910), the court held an agreement to be a real estate lease.  Id. at 251-52.
Under the terms of that agreement, the lessee was to have possession of
agricultural land for three years and to pay a certain cash rent.  Id.  However,
the ownership of all crops taken from the land were to remain in the lessor
until such time as the lessee paid the rent due and owing.  Id. at 250-51.  The
court stated that it was immaterial whether the landlord received its rent as
cash, or as a share of the crops, the agreement was nevertheless a lease.  Id. at
252.

Here, the agreement called the Civic Center "owner" and Mr. Soltesz the
"lessee."  It granted to the lessee the right to use the owner's real property,
acknowledging that the property was given to the lessee for the lessee's use.
The contract set a specified term–five years–for the length of the lessee's usage.
And it provided that the lessee was to "surrender" the property back over to the

owner in the same good condition in which it was "received."  The contract is
clearly a lease.  SDCL § 43-32-1;  <u>Aegerter</u>, 55 S.D. 337, 226 N.W. at 346-47;
<u>Dobbs</u>, 25 S.D. 177, 126 N.W. at 250-52.

Unlike the license described in <u>Price & Baker Co. v. Madison</u>, 17 S.D.
247, 95 N.W. 933, Mr. Soltesz was not merely given permission to enter upon
the Civic Center's property to perform a specified task and then withdraw in
the interim until it was time to perform the next task.  Mr. Soltesz permanently
occupied the property for the duration of the lease in the sense that he
installed and kept his equipment and inventory on the property continuously.
He also testified that he had keys to the leasehold area and could access it
whenever he wanted so long as the Civic Center was open.  <u>See</u> Docket No. 31-
3, page 18 (depo. page 151).

Defendants rely on two out-of-state cases in support of their assertion
that the agreement with Mr. Soltesz was a license and not a lease.  The court
notes that the law of neither North Dakota nor New York are binding precedent
for the claims in this case.  Only South Dakota law provides binding authority.
In addition, each case is distinguishable.

In <u>Lee v. North Dakota Park Service</u>, 262 N.W.2d 467 (N.D. 1977), the
court held that a contract denominated as a "lease" was really a "license."  The
agreement granted to Lee the right to operate a third-party concession on the
property described in the agreement.  <u>Id.</u> at 468.  The party which purported to

20

give to Lee this "leasehold" interest was a subdivision of the state of North Dakota, the Garrison Park District.  Id.  The problem was, the Garrison Park District did not own the land and had no right to grant a "lease."  Instead, the property was owned in fee simple by the United States government.  Id.  The United States allowed the Garrison Park District to occupy the property pursuant to a 25-year *license* only.  Id.  Since Garrison Park District itself had only a license interest in the property, it could grant to Lee only a license–Garrison Park could not grant to Lee an interest in the property (a lease) that was greater than what Garrison Park itself held (a license).  Id. at 472-75.

Here, it is clear that the Civic Center was the fee simple holder of the title to the property–the "owner."  It clearly had the power to grant to Mr. Soltesz a leasehold interest in that property.  Therefore, the holding in the Lee case is inapposite.  Interestingly, in describing the differences between leases and licenses, the North Dakota court in Lee noted that a license is generally revocable at will without notice.  Id. at 471 (citing Strandholm v. Barbey, 145 Or. 427, 440, 26 P.2d 46, 51 (1933)).  In the agreement between the Civic Center and Mr. Soltesz, the agreement was terminable only upon giving a 45-day notice.  See Docket No. 1-1.

The Anderson v. Moses case relied upon by defendants, while colorful, is also inapposite.  In Anderson, a committee which supported Morton Sobell, an

21

associate of Julius and Ethel Rosenberg, made dinner reservations at the Tavern-on-the-Green, a public restaurant in Central Park in New York City. Anderson v. Moses, 185 F. Supp. 727, 729 (S.D.N.Y. 1960).[5]  The dinner was to include a speaking program to obtain public support for Sobell.  Id.  The Tavern-on-the-Green operated its restaurant pursuant to a license granted by the City of New York for that purpose.  Id.  After newspaper articles were published that were critical of the purposes of the Sobell committee, and which questioned why such a gathering should be allowed on city property, the Tavern canceled the dinner.  Id. at 730.  Members of the committee brought suit under § 1983, alleging that the city had violated their First Amendment right to free speech.  Id.

In ruling on the parties' cross-motions for summary judgment, the court noted that Central Park is held by the City of New York pursuant to the New York City Charter, which declared such park property to be "inalienable."  Id. at 732.  The Charter granted to the City the right to grant licenses with respect to park property, but forbid the granting of leases or the sale of any property interest.  Id.  Thus, like Garrison Park in the Lee case, the City of New York did not have the power to grant a lease, therefore the agreement whereby the

---

[5]Sobell was convicted with the Rosenbergs of conspiring to transmit American national defense information to the Soviet Union.  Anderson, 185 F. Supp. at 729.  Unlike the Rosenbergs, who received death sentences, Sobell received a 30-year penitentiary sentence.  The purpose of the Committee to Secure Justice for Morton Sobell was to secure Sobell's release from prison.

Tavern-on-the-Green was able to use the property in the <u>Anderson</u> case could not, as a matter of law, be a lease.  <u>Id.</u>

Based on South Dakota law, defendants' own sworn testimony, and an examination of the agreement itself, this court concludes that the agreement between the Civic Center and Mr. Soltesz whereby Mr. Soltesz was allowed to operate his pizza concession was a lease.  It remains to determine whether defendants violated Mr. Soltesz's constitutional rights when they summarily took back that leasehold interest.

### 2.     Whether There are Genuine Issues of Material Fact as to Defendants' § 1983 Liability

Did defendants violate Mr. Soltesz's constitutional rights under either the Fourth or the Fourteenth Amendment when they ousted him from his leasehold without resort to South Dakota's statutory eviction procedures?  More to the point, are there genuine issues of material fact as to defendants' liability on these claims?

Mr. Soltesz asserts that resort to statutory eviction procedures is mandatory whenever a landlord wishes to terminate a lease with a tenant.  However, it is clear that, under South Dakota law, the parties to a lease may provide otherwise.  <u>Thunderstick Lodge, Inc.</u>, 1998 SD 110, ¶¶ 13-18, 585 N.W.2d at 822-23.  In that case, where the parties had negotiated a binding arbitration provision which applied to "differences between the parties," the

23

court held that arbitration was required and that the landlord could not resort to statutory eviction procedures as an alternative to arbitration.  Id.

However, the contract between the Civic Center and Mr. Soltesz does not address statutory eviction procedures.  See Docket No. 1-1.  The only mention in the lease as to termination of the lease required the Civic Center to give Mr. Soltesz 45 days notice prior to termination of the lease.  Id.  As discussed above, it is undisputed that the Civic Center did not comply with this contractual provision.

The Civic Center also did not comply with South Dakota's statutory eviction procedures.  If a lessee breaches the lease in a way that operates to terminate the lease as the Civic Center alleges Mr. Soltesz did by assaulting his employee, see SDCL § 21-16-1(7), South Dakota law provides for an expedited procedure for the Civic Center to regain possession of its property.  See SDCL ch. 21-16.  Thus, South Dakota's statutory eviction procedures encompasses situations like the present one where the landlord alleges that the tenant has breached the terms of the lease in a way so as to terminate the lease.  See § 21-16-1(7).

Had the Civic Center made recourse to South Dakota's statutory eviction procedures, the Civic Center would have been required to serve Mr. Soltesz with a notice requiring him to quit the premises within three days.  See SDCL § 21-16-2.  If Mr. Soltesz did not vacate the premises within the three-day

24

period, the Civic Center could have filed a complaint to evict him.  See SDCL §
21-16-6.

Mr. Soltesz would have been required to make his appearance and
answer the complaint within four days.  See SDCL § 21-16-7.  A continuance of
up to five days could have been granted to Mr. Soltesz only if he posted surety
to cover the rent due to the Civic Center.  Id.  Trial could be noticed up as
quickly as two days following Mr. Soltesz filing his answer.  See SDCL § 21-16-
8.  Thus, the entire procedure--from the first notice to quit to final judgment--
could have been had in as few as nine days.  Did the Civic Center's failure to
follow these statutory procedures violate Mr. Soltesz's constitutional rights as a
matter of law?

### a.    Fourth Amendment

#### i.    Has there been a seizure?

In Soldal v. Cook County, 506 U.S. 56 (1992), a tenant had a lease to
place his trailer home on the landlord's lot.  Id. at 57-58.  The landlord began
statutory eviction proceedings against the tenant, but then forcibly evicted the
tenant with the help of several sheriff's deputies before obtaining a judgment of
eviction through the courts.  Id. at 58.  The sheriff's deputies, at the landlord's
behest, removed the tenant's trailer home, doing significant damage to the
home in the process.  Id. at 58-59.  Later, a state court judge ordered the
landlord to replace the tenant's home back on the lot because the eviction had

been unlawful.  Id. at 59.  The tenant then sued under § 1983 seeking damages for the seizing of his home and for the deprivation of his right of possession of the lot.  Id.

The Supreme Court granted certiorari to answer the question whether the facts in Soldal's case implicated the Fourth Amendment.  Id. at 60.  The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . ."[6]  Id. at 61.  A "seizure" occurs whenever "there is some meaningful interference with an individual's possessory interests in that property."  Id. at 61 (quoting United States v. Jacobsen, 466 U.S. 109, 113 (1984)).

Applying this analysis, the Supreme Court had no trouble concluding that the tenant had been deprived of a property interest, noting that the literal carrying away of Soldal's home gave "new meaning to the term 'mobile home.'"  Id. at 61, 60-72.  In doing so, the Court rejected the lower court's analysis that, because only the tenant's property interests had been affected without a corresponding invasion of privacy or deprivation of liberty that the Fourth Amendment was not implicated.  Id. at 61-72.  The Court found that a seizure had occurred even though the tenant subsequently got his property back.  Id.

---

[6]The provisions of the Fourth Amendment are made applicable to the states under the terms of the Fourteenth Amendment.  Soldal, 506 U.S. at 61.

Although the Fourth Amendment extends to property, it does not protect possessory interests in all kinds of property.  Id. at 62 n.7 (citing Oliver v. United States, 466 U.S. 170, 176-77 (1984) ("effects" under the Fourth Amendment does not include open fields)).

In Thomas v. Cohen, 304 F.3d 563 (6th Cir. 2002), some women who had been evicted from a women's shelter brought a § 1983 action.  Id. at 565.  Each of the women had a bedroom of her own, a key to the door of the shelter, and each paid monthly rent to the shelter.  Id. at 565-66.  Defendants conceded that the plaintiffs constituted "tenants" under state law.  Id. at 566.  The director of the women's shelter called local police to remove the plaintiffs from the shelter because she believed the plaintiffs had violated the rules of the shelter by possessing alcohol and illegal drugs and by physically threatening other residents of the shelter.  Id. at 566-67.  Plaintiffs left without any physical altercation between them and the police, but they were not able to retrieve all of their belongings prior to the eviction.  Id. at 567.  The plaintiffs alleged that the defendant had violated their constitutional rights under the Fourth and Fourteenth Amendments in evicting them without resorting to statutory eviction procedures and obtaining a judgment of eviction first.  Id.

This case came before the Sixth Circuit not on the merits of the plaintiffs' claims, but on the police officers' claims that they were entitled to qualified immunity.  Id. at 565.  The district court had denied the police officers' motion

27

for summary judgment on qualified immunity, and the <u>Thomas</u> case was their intermediate appeal of that issue.  <u>Id.</u>  Thus, the issue before the court was whether there were genuine issues of material fact as to (1) whether plaintiffs' constitutional rights had been violated and (2) whether those rights were so clearly established that a reasonable officer would understand that his actions violated those rights.  <u>Id.</u> at 568.

As in <u>Soldal</u>, the Sixth Circuit in <u>Thomas</u> had no trouble finding that the plaintiffs' property had been seized by the officers.  <u>Id.</u> at 572-74.  The court stated that "[w]hen a governmental agent carries out an eviction without a court order and in the absence of any colorable legal authority," a "seizure" of property within the meaning of the Fourth Amendment occurs.  <u>Id.</u> at 572.  Importantly, because of the procedural posture of the case, the Sixth Circuit was not holding that plaintiffs were entitled to judgment as a matter of law, only that defendants were not so entitled.

Here, Mr. Soltesz's property was clearly seized within the meaning of the Fourth Amendment.  At a minimum, the Civic Center seized both the leasehold interest and Mr. Soltesz's equipment and inventory between February 3, 2011, the date he was served with the notice of trespass, and February 8, 2011, the date the Civic Center sent written notice of its intent to terminate the lease. The Civic Center has asserted facts in support of an argument that, after February 8, 2011, Mr. Soltesz regained his inventory and that the only reason

28

he did not regain his equipment at that time was because he himself opted not to while he was carrying on negotiations with the third party.  Mr. Soltesz denies this motivation.  However, these facts–even if true--do not obviate the seizure which occurred between February 3-8, a seizure that the Civic Center does not dispute.

### ii.    Was the seizure unreasonable?

Once it has been determined that a seizure had occurred, the next step in the analysis is to determine whether that seizure was reasonable, which entails a balancing test.  Soldal, 506 U.S. at 61-62.  The reasonableness inquiry requires a "careful balancing of governmental and private interests." Id. at 71 (quoting New Jersey v. T.L.O., 469 U.S. 325, 341 (1985).  The reasonableness of a seizure is an objective inquiry.  Id.  Unfortunately, neither party addresses this balancing part of the Fourth Amendment test.

Where a governmental agent evicts a tenant pursuant to a court order, it is "laborious indeed" to try to prove that the seizure was unreasonable.  Id. Similarly, where the governmental agent merely observes and maintains the peace while a private landlord evicts his tenant pursuant to statutory eviction procedures, the seizure is not unreasonable.  Thomas, 304 F.3d at 575.  But both of those situations stand in stark contrast to the situation where a governmental agent is an active participant in an eviction that takes place without a warrant or other court order legitimating the eviction.  Id.

29

The <u>Thomas</u> court held that the officers' eviction of the women's shelter tenants was unreasonable (rather, the court held it was not reasonable as a matter of law). <u>Id.</u>  In examining the governmental interest, the court discounted that interest because the officers knew that the plaintiffs were lawful occupants of the property, who had keys to allow them to enter and who had paid rent. <u>Id.</u>  In addition, the officers knew or should have known that a court order was necessary to perform an eviction. <u>Id.</u>  And there was no apparent reason for immediate removal of the women without obtaining a court order first. <u>Id.</u>  The women's interest in maintaining possession of the space in which they lived and had their personal possessions was, by contrast, a weighty interest. <u>Id.</u>

Exigent circumstances such as those which pose an immediate threat of danger can sometimes justify an eviction without a court order. <u>Id.</u> <u>See</u> <u>Flatford v. City of Monroe</u>, 17 F.3d 162, 170-71 (6th Cir. 1994) (extensive disrepair and dilapidation of building posed an imminent threat to occupants, supported by a building safety inspector's order, thus justifying police officers' eviction of occupants without a court order). However, defendants in this case have not alleged exigent circumstances.  Even if they did, the evidence before the court is that the alleged assault occurred some seven hours before defendants evicted Mr. Soltesz.  Defendants apparently waited until the end of the regular food-serving time period for the Stock Show before serving

30

Mr. Soltesz with their notice of trespass.  If Mr. Soltesz posed an imminent threat, surely defendants would have evicted him shortly after the alleged assault instead of allowing him to finish out the work day before doing so.

Nevertheless, the governmental interest in this case is more weighty than it was in Thomas–an actual physical assault is alleged to have occurred, rather than a threat to assault someone.  If a member of the public had committed an assault on Civic Center premises, there is no doubt that the Civic Center could expel him from its premises.  But this interest is undermined by defendants' reaction to it:  rather than having Mr. Soltesz removed from the premises immediately, they may have allowed him to stay until the end of the day because it served defendants' commercial interests to do so.

The court could take judicial notice of the fact that the Civic Center is a large commercial enterprise, well-advised by city attorneys who are on staff throughout the year.  The court could note that the Civic Center manages a number of complex commercial relationships and agreements, including numerous leases like the one entered into with Mr. Soltesz/Top Dog.  Finally, defendants were the author of the lease they entered into with Mr. Soltesz and should have been well aware of the legal methods at their disposal to effectuate an early termination of that lease.  At a minimum, during the seven hours that passed between the alleged assault and the serving of the notice of trespass on Mr. Soltesz, Mr. Maliske as the manager of the Civic Center could have called

31

upon a city attorney to ask his advice as to the legal course of action available to the Civic Center under these circumstances.

However, neither party has asked the court to take judicial notice of the nature of the Civic Center and its business dealings.  To do so would be unfair without prior notice and an opportunity to be heard.  <u>See</u> Fed. R. Evid. 201(e) (allowing a court to take judicial notice of adjudicative facts after notice and an opportunity to be heard).

Mr. Soltesz's interests, against which the governmental interests are balanced, are less weighty than the women tenants' interests in <u>Thomas</u> or the mobile home owner in <u>Soldal</u>.  In those two cases, the leasehold interest that was seized was their home–a space that is at the core of Fourth Amendment protections.  Both plaintiffs in those cases were literally rendered homeless by the defendants' evictions.

Here, the leasehold in question was merely commercial, and it was occupied or used only during certain specified events at the Civic Center. During the interim times between events, Mr. Soltesz/Top Dog had limited access to the leasehold.  Also, Mr. Soltesz did not live in the leasehold and, so, he was not rendered homeless by the eviction.  Finally, the ambiguity as to who was the real lessee in interest as to the leasehold–Mr. Soltesz personally or Top Dog--is important to the balancing test as well because it affects how draconian the government's seizure of the leasehold is perceived to be under the

32

balancing test.  If Top Dog is the real lessee, then the seizure, while still a seizure, was less draconian because Tana Soltesz continued to have some access to the leasehold and to the equipment and inventory stored there.  Such a seizure may be reasonable under the Fourth Amendment given the nature of the governmental interest involved.

The court's ability to analyze the Fourth Amendment balancing test is hampered by the parties' failure to address the test and to inform the court of relevant facts.  Returning to first principles, it is Mr. Soltesz as the movant in this case to demonstrate his entitlement to judgment as a matter of law on defendants' liability on his Fourth Amendment claim.  This, he has failed to do.  Accordingly, the court recommends denial of Mr. Soltesz's motion for partial summary judgment on his Fourth Amendment claim under § 1983.

### b.    Fourteenth Amendment

The Due Process Clause requires notice and an opportunity to be heard incident to a deprivation of life, liberty or property by the government.  Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950).  The government must provide the required notice and opportunity to be heard "at a meaningful time and in a meaningful manner." Fuentes v. Shevin, 407 U.S. 67, 80 (1972) (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)).  In order to prove a procedural due process violation, the plaintiff must show (1) that he had a protected property interest at stake and (2) that he was

33

deprived of that interest without due process of law.  Hopkins v. Saunders, 199
F.3d 968, 975 (8th Cir. 1999).

> **i.   whether Mr. Soltesz had a protected property interest**

In order to prove that he has a protected property interest, Mr. Soltesz
must show that he had a " 'legitimate claim of entitlement' to a benefit that is
derived from a source such as state law." Hopkins, 199 F.3d at 975 (quoting
Board of Regents v. Roth, 408 U.S. 564, 577 (1972)).  Possessory interests in a
leasehold invoke due process protections.  Thomas, 304 F.3d at 576 (citing
Fuentes v. Shevin, 407 U.S. 67, 87 (1972)).  The court concludes that
Mr. Soltesz's rights arising out of the lease with the Civic Center is a property
interest that is protected by the Due Process Clause as was his interest in the
equipment and inventory he had stored on the leased premises.

> **ii.   what process is required prior to deprivation of that property interest**

The due process clause of the Fifth and Fourteenth Amendments
sometimes requires pre-deprivation notice and a hearing.  Fuentes, 407 U.S. at
82.  However, under some circumstances, post-deprivation notice and a
hearing will satisfy constitutional due process requirements.  Reese v.
Kennedy, 865 F.2d 186, 187 (8th Cir. 1989).  The Due Process Clause " 'is not
a technical conception with a fixed content unrelated to time, place and
circumstances,' but instead 'is flexible and calls for such procedural

protections as the particular situation demands.' " <u>Walters v. Wolf</u>, 660 F.3d 307, 311 (8th Cir. 2011) (quoting <u>Mathews v. Eldridge</u>, 424 U.S. 319, 332 (1976)).  The "content of the notice and the nature of the hearing" required by the Due Process Clause "depend[s] on appropriate accommodation of the competing [governmental and private] interests involved." <u>Goss v. Lopez</u>, 419 U.S. 565, 579 (1975).

 In evaluating what process is due, the balancing factors from <u>Mathews v. Eldridge</u> must be considered.  However, as with the balancing part of the Fourth Amendment test, neither party has addressed the <u>Mathews</u> factors. Those factors are: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." <u>Mathews</u>, 424 U.S. at 334-35.

 In evaluating the first factor--the private interest affected--whether the leasehold was the plaintiff's residence is a significant consideration.  <u>Thomas</u>, 304 F.3d at 580.  The "right to maintain control over [one's] home . . . is of historic and continuing importance." <u>Id.</u> (quoting <u>United States v. James Daniel Good Real Prop.</u>, 510 U.S. 43, 44 (1993)).  When the lease in question is

a residence, "the government's interest in enforcing a landlord's unauthorized directives pales in comparison to the importance of Plaintiffs' interest in maintaining possessory rights to their place of residence." Id.

Here, Mr. Soltesz's lease was commercial, not residential.  He did not live at the Civic Center and the Civic Center's ouster of him from that space did not render Mr. Soltesz homeless.  But a pre-deprivation notice and hearing has been required under some circumstances that do not involve depriving one of one's home.  See Fuentes, 407 U.S. at

When considering whether pre-deprivation process is required, or whether post-deprivation process will suffice, the court must consider what post-deprivation remedies are afforded by the state.  Thomas, 304 F.3d at 578-79; Flatford, 17 F.3d at 168-69.  Here, as evidenced by Mr. Soltesz's complaint in this case, he has available to him common law tort remedies under South Dakota law such as conversion, breach of contract, and tortious interference with business relations.  See Docket No. 1.

Like in the Fourth Amendment context, exigent circumstances may justify postponing the hearing afforded the tenant until after eviction takes place.  Thomas, 304 F.3d at 576-77 (citing Fuentes, 407 U.S. at 80-81).

Another consideration in determining whether a post-deprivation process is constitutionally adequate is whether the facts supporting the deprivation of property are "patently objective facts which are not the type which would

36

foreseeably be controverted." Horton v. Marshall Pub. Schools, 769 F.2d 1323, 1333 (8th Cir. 1985). Where the deprivation of property or liberty is based on such facts, the failure to afford a due process hearing does not violate the constitution. Id. Here, the incident involving Mr. Soltesz and his employee was captured on videotape, reducing the facts to a nature that they are largely not controvertable. However, Mr. Soltesz does not admit that he criminally assaulted his employee, asserting that the employee struck first. Who took the first swing and whether Mr. Soltesz was physically threatened in any way before he reacted is not documented on the video tape. Thus, the facts here are not completely "patently objective facts" which are not susceptible of controverting.

Another important factor to be considered is whether the government deprived the plaintiff of his property interest in *an ad* hoc fashion based on the judgment of an individual governmental employee, or whether the government deprived the plaintiff of his property interest pursuant to official policy. This consideration is at the heart of analyzing the adequacy of pre- or post-deprivation hearing.

In Reese v. Kennedy, 865 F.2d 186 (8th Cir. 1989), the plaintiff had lived with her boyfriend in the same house for two years. Id. at 186. When he was out of town, the boyfriend, in whose name the house was deeded, asked the Sioux Falls police to forcibly remove the plaintiff and her children from the

37

home.  Id.  When police showed up and asked the plaintiff to leave, the plaintiff asked to see a court order.  Id.  The officers threatened to put the plaintiff in jail.  Id.  The plaintiff then left the home, but was not allowed to remove a car or other personal property she claimed was hers.  Id.

The plaintiff then sued under § 1983, alleging that the police had violated her due process rights by depriving her of property without following the hearing and notice provisions of state statutory eviction procedures.  Id. at 187.  The court affirmed the district court's dismissal of the § 1983 claim, characterizing the police officers' actions as "random and unauthorized" and holding that South Dakota state law, including common law tort, provided adequate postdeprivation remedies.  Id. (citing Parratt v. Taylor, 451 U.S. 527, 541, 543-44 (1981)).  The court rejected the plaintiff's argument that the officers' failure to follow state eviction procedures resulted in a due process deprivation.  Id.

The Sixth Circuit criticized and refused to follow the Reese case, noting that the Eighth Circuit decided Reese prior to the Supreme Court's decision in Soldal.  Thomas, 304 F.3d at 578-79.  The Sixth Circuit also indicated that the Eighth Circuit's interpretation of Parratt was "outdated," and that the "random and unauthorized" analysis is no longer applied in situations where a deprivation of rights is predictable.  Id. at 579 (citing Zinermon v. Burch, 494 U.S. 113, 136 (1990)).

38

However, <u>Reese</u> continues to be followed in the Eighth Circuit even following the <u>Soldal</u> decision of 1992 and the <u>Zinermon</u> decision of 1990.  In <u>Harris v. St. Louis Police Dept.</u>, 164 F.3d 1085 (8th Cir. 1998) (*per curiam*), the Eighth Circuit cited <u>Reese</u> in approving a district court's dismissal of § 1983 claim for police officer's unwarranted destruction of plaintiff's bus pass because there were adequate postdeprivation state tort remedies for the taking of the plaintiff's property.  <u>Id.</u> at 1086.

Likewise, in <u>Kornblum v. St. Louis County</u>, 72 F.3d 661 (8th Cir. 1995), the court cited <u>Reese</u> approvingly for the proposition that the mere failure of the county to follow state statutory procedures did not give rise, in and of itself, to a due process deprivation.  <u>Id.</u> at 668.  Rather, the court stated that "[w]e must look at what actions the County took, not what local law may or may not have been followed."  <u>Id.</u>  <u>See also</u> <u>Smith v. St. Louis County Police Dept.</u>, 2001 WL 293820, *2 (E.D. Mo. 2011) (relying on <u>Reese</u> for the holding that an intentional taking of property does not amount to a violation of due process where the state provides an adequate postdeprivation remedy); <u>Twitty v. Frey</u>, 2009 WL 2032075, *2 (E.D. Mo. 2009) (same); <u>La Societe Generale Immobiliere v. Minneapolis</u>, 827 F. Supp. 1431, 1436 (D. Minn. 1993) (relying on <u>Reese</u> in dismissing plaintiff's procedural due process property claim under § 1983 because state law provided adequate postdeprivation remedies for the

defendant's breach of contract), rev'd. on other grounds, 44 F.3d 629 (8th Cir. 1994).

A very recent decision of the Eighth Circuit clarifies under what circumstances the Reese/Parratt analysis applies and under what circumstances it does not. See Walters v. Wolf, 660 F.3d 307 (8th Cir. 2011). In that decision, the court discussed under what circumstances a plaintiff who is deprived of a property interest through government action is entitled to the "customary" predeprivation hearing, and under what circumstances the holding in Parratt is applicable and postdeprivation remedies are adequate. Id. at 312. The court explained that the Parratt analysis is not an exception to the Mathews balancing factors, but rather it represents "a special case of the general Mathews v. Eldridge analysis, in which postdeprivation tort remedies are all the process that is due, simply because they are the only remedies the State could be expected to provide." Id. (citing Zinermon v. Burch, 494 U.S. 113, 128 (1990)).

Reviewing the facts in Parratt, whereby a prisoner's mail-order hobby kit was misplaced and lost by a prison employee, the Walters court reiterated a passage from Parratt: "[i]n such a case, the loss is not a result of some established state procedure and the State cannot predict precisely when the loss will occur. It is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place. Because . . . in most

40

cases it is not only impracticable, but impossible, to provide a meaningful

hearing before the deprivation."  Id. (quoting Parratt, 451 U.S. at 541).

> The court went on to explain:

> Parratt is not an exception to the Mathews balancing test, but
> rather an application of that test to the unusual case in which one
> of the variables in the Mathews equation–the value of
> predeprivation safeguards–is negligible in preventing the kind of
> deprivation at issue.  Therefore, no matter how significant the
> private interest at stake and the risk of its erroneous
> deprivation, . . . the State cannot be required constitutionally to do
> the impossible by providing predeprivation process.

Id. at 312-13 (quoting Zinermon, 494 U.S. at 129) (citation omitted).

> The Parratt analysis applies whether the errant behavior of the state

employee was merely negligent, or whether it was intentional.  Id. at 313 (citing

Hudson v. Palmer, 468 U.S. 517, 533).  Thus, harmonizing the Sixth Circuit's

analysis in Thomas and the Eighth Circuit's analysis in Reese, the rule that

emerges is that Parratt is still good law and applies in situations involving

rogue or idiosyncratic decisions of state employees that result in deprivations

of rights, while the "customary" rule in favor of a predeprivation hearing applies

in situations where the state employee deprives a plaintiff of rights pursuant to

official policy of the government.  Walters, 660 F.3d at 312-14.

> In addition, distinctions are draw between an initial deprivation, which

may have been justified at the time, and the length of delay until the state

affords the plaintiff with a post-deprivation hearing.  Id. at 314.  Even though it

may not be practicable for the state to provide a pre-deprivation hearing prior

to the initial taking under such circumstances, the state might still run afoul of the due process clause by failing to provide a prompt enough hearing.  Id. (citing Coleman v. Watt, 40 F.3d 255, 257, 260 (8th Cir. 1994) (holding that while a predeprivation hearing might not have been necessary before seizing plaintiff's vehicle, a one-week delay until a post-deprivation hearing was afforded did not, as a matter of law, satisfy due process concerns under Mathews and Parratt)).

In Walters, the plaintiff was the subject of a routine traffic stop, whereupon it was discovered that there was an outstanding arrest warrant for him.  Walters, 660 F.3d at 309.  The traffic-stop officer arrested Walters on the warrant and confiscated a pistol and some ammunition from the vehicle for which Walters held a valid concealed weapons permit and which Walters had purchased lawfully.  Id.  Subsequent to the traffic stop, a complaint was asserted against Walters for unlawful possession of a concealable firearm, but the complaint was dismissed a short time later for lack of probable cause.  Id.

Despite Walters' repeated requests for the return of his property, official police department policy required Walters to obtain a writ of replevin issued by a court before the police would return his weapon to him.  Id. at 309-10. Walters then brought a § 1983 action, alleging that defendants had deprived him of property without due process of law.  Id. at 308, 310.

42

The court noted that there were two deprivations of Walter's property interests in the gun:  the first occurred when the officer confiscated Walters' pistol pursuant to his arrest on the outstanding warrant and the second occurred after the warrant and associated charges were dismissed and the state continued to refuse to return Walters' pistol to him.  Id. at 314.  As to the first deprivation, the court held that there was no Due Process violation.  Id. The initial seizure of the pistol was lawful under the Fourth Amendment because it was supported by a probable cause determination, even though that determination subsequently was determined to have been unfounded.  Id. When a seizure is made pursuant to the Fourth Amendment for criminal investigatory purposes and the seizure satisfies Fourth Amendment requirements, the seizure also satisfies any pre-deprivation procedural due process.  Id. (citing PPS, Inc. v. Faulkner Cnty., Ark., 630 F.3d 1098, 1107 (8th Cir. 2011)).

The court reached a contrary holding as to the second seizure.  Id. at 314-15.  The second deprivation took place pursuant to an official city policy, thus taking the analysis outside of the "random and unauthorized conduct" analysis of Parratt.  Id. at 315.  Since the deprivation was authorized by the city pursuant to official policy, the court held that access to post deprivation tort remedies was "inherently insufficient" to satisfy due process concerns.  Id.

In Coleman, cited by the Walters court, a city judge had issued an order mandating that law enforcement officers impound any vehicle stopped for violating certain laws regarding the holding of a valid driver's license, the display of proper license plates, and the maintenance of motor vehicle liability insurance.  Coleman, 40 F.3d at 257.  The impounded vehicle could not be retrieved until the driver appeared in municipal court and paid all fines, costs or other sanctions associated with the law violation and presented to the court current, valid licenses, license plates, or proof of insurance.  Id. at 257-58.  The plaintiff did not allege that he should have had a pre-deprivation hearing, and the city did not contend that no post-deprivation hearing was necessary, so the only issue before the court was the promptness of the post-deprivation hearing afforded by the city judge's order.  Id. at 260.  The Eighth Circuit held that the order was unconstitutional on its face for failure to provide adequately prompt postdeprivation hearings.  Id.  The Coleman court rejected the city's argument that Parratt applied, noting that Parratt could not apply to the facts in this case because the officers were impounding cars pursuant to official government policy in the form of the judge's order, and were not, therefore, "random and unauthorized."  Id. at 262.

Viewed through the clarifying lens provided in the Walters opinion, the results in many other cases can be harmonized.  For example, in Fuentes, where the issue was the deprivation of personal property such as stereos,

44

stoves, and furniture, the court held that a predeprivation hearing was required "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." Fuentes, 407 U.S. at 82 (quoting Boddie v. Connecticut, 401 U.S. 371, 378-79 (1971)). The deprivations at issue in Fuentes were pursuant to official governmental policy in the form of replevin statutes that allowed summary seizure of goods upon an *ex parte* application by another person. Id. at 69-70, 73-78. The replevin orders were issued to law enforcement officers who were then authorized to break open a house, building, or enclosure, if necessary, to obtain the personal property described in the replevin order. Id. at 75. These statutes, which provided for only post-deprivation hearing, were declared violative of the Due Process Clause. Id. at 83-84, 90-93, 96-97.

Mr. Soltesz cites Arnold Murry Construction LLC v. Hicks, 2001 S.D. 7, ¶ 17, 621 N.W.2d 171, for the proposition that the South Dakota statutory eviction procedures satisfy due process requirements. That much is not contested herein. However, Mr. Soltesz then goes on to argue, based on Hicks, that *failure to follow* the South Dakota statutory eviction procedures *violates* due process. This conclusion does not follow. A finding that the statutes themselves satisfy due process does not lead to the conclusion that failure to follow them necessarily results in unconstitutional conduct. One cannot conflate the two concepts. The constitutionality of the defendants' actions in

this case under the due process clause must be judged against the <u>Mathews</u>
factors, as discussed above.

Here, again because the parties never address the <u>Mathews</u> balancing
factors, there are a number of unanswered questions.  The court is not
informed of what the "official policy" of the city was.  At a guess, the court
would assume that the 45-day notice provision memorialized in the Civic
Center lease with Mr. Soltesz/Top Dog is the city's official policy.  However, no
party has addressed whether the city had an official or unofficial policy of
summary evictions like the one encompassed by the facts of this case.  As
discussed above, that determination is important in determining whether
defendants' behavior was random and unauthorized, and thus subject to the
<u>Parratt</u> analysis, or whether it was officially sanctioned conduct, and thus
conduct where a pre-deprivation hearing is "customary."

The court also notes that there is ambiguity about the reason why
Mr. Soltesz/Top Dog did not remove its equipment until May.  Defendants
suggest that Mr. Soltesz left his property at the leasehold premises because it
was convenient for him while he was exploring the possibility of transfer of the
equipment and leasehold to a third party.  Not only the fact of a deprivation,
but the promptness of a post-deprivation hearing is important to due process
analysis.  Could Mr. Soltesz/Top Dog have removed its property sooner?  If so,
how much sooner?

In <u>Coleman</u>, the court noted that summary judgment was inappropriate where factual issues as to the timing of the postdeprivation hearing existed: "If, for example, the first hearing date was routinely assigned by the municipal court pursuant to the order or to other established procedures, then Coleman's due process claim will pass the threshold test of causation.  If, on the other hand, Coleman had notice of the availability of an earlier opportunity to be heard but sat on his rights for several days before requesting a hearing, then Coleman cannot complain that the City failed to provide a constitutionally prompt hearing."  <u>Coleman</u>, 40 F.3d at 262.

Likewise, summary judgment was inappropriate in <u>Gentry v. City of Lee's Summit</u>, 10 F.3d 1340 (8th Cir. 1993).  In that case, Gentry had leased property from the city for commercial purposes, opening a restaurant and cocktail bar after making renovations to the premises.  <u>Id.</u> at 1341-42.  Less than a year after entering into the lease, and only three months after opening the restaurant, Gentry closed the restaurant for further renovations, although the cocktail bar remained open.  <u>Id.</u> at 1342.  The lease agreement allowed the city to repossess the premises with force, with no legal process, and without notice or demand if Gentry vacated or abandoned the property.  <u>Id.</u> at 1341-42.

Believing that Gentry had abandoned the property, the city forcibly took the property back without notice or a hearing.  <u>Id.</u> at 1342.  Gentry sued under § 1983.  <u>Id.</u> at 1341.  In analyzing the <u>Mathews</u> factors, the <u>Gentry</u> court noted

47

that there was no question that the City deprived Gentry of a protected

property interest, that the property interest was entitled to substantial weight

given the value of the renovations Gentry had poured into the premises, and

that the city could feasibly have given Gentry a predeprivation hearing with

little inconvenience or cost.  Id. at 1344-45.  In this vein, the court noted that

the "city can point to no exigency which demanded its entry of the restaurant"

without prior notice and a hearing.  Id. at 1345.  However, because there was a

genuine issue of material fact as to whether Gentry had abandoned the

property, the court held that summary judgment could not issue.  Id.

Likewise, the court finds partial summary judgment on Mr. Soltesz's due

process claim to be inappropriate on this record.  There are genuine issues of

material fact as to whether the conduct was random and unauthorized, or the

result of official city policy.  There are also genuine issues about why

Mr. Soltesz was not reunited with his inventory and equipment until May.

### c.    Liability of the City of Rapid City

Municipalities are not vicariously liable under § 1983 for the acts of their

employees and agents.  Monell v. Dept. of Social Services, 436 U.S. 658, 690-

91 (1978).  Rather, municipal liability can only lie where the plaintiff shows

that the constitutional deprivation took place pursuant to an official policy or

custom of the city.  Id.; Young v. Harrison, 284 F.3d 863, 869-70

(8th Cir. 2002).

48

Mr. Soltesz never addresses the standard for municipal liability under § 1983.  He never cites the court to any evidence that the City of Rapid City had, as an official policy or custom, the practice of evicting commercial tenants from their property without resort to South Dakota statutory eviction procedures.  Defendants have also failed entirely to address the <u>Monell</u> standard in any way.

Mr. Soltesz's motion for partial summary judgment should not be granted as to the liability of the City of Rapid City under § 1983.  He has not shown that the Civic Center was acting pursuant to official municipal policy or custom.  The court recommends the denial of Mr. Soltesz' motion for partial summary judgment against the City on his § 1983 claim.

**D.    Conversion**

The final claim on which Mr. Soltesz seeks the entry of partial summary judgment establishing defendants' liability as a matter of law is his conversion claim.  "Conversion is the unauthorized exercise of control or dominion over personal property in a way that repudiates an owner's right in the property or in a manner inconsistent with such right."  <u>First American Bank & Trust, N.A. v. Farmers States Bank</u>, 2008 S.D. 83, ¶ 38, 756 N.W.2d 19, 31 (quoting <u>Chem-Age Indus., Inc. v. Glover</u>, 2002 S.D. 122, ¶ 20, 652 N.W.2d 756, 766).  The *prima facie* elements of a claim of conversion are:

1.    Mr. Soltesz had a possessory interest in the property;

2.     Mr. Soltesz's interest in the property was greater than defendants' interest in the property;

3.     defendants exercised dominion or control over or seriously interfered with Mr. Soltesz's interest in the property; and

4.     defendants' conduct deprived Mr. Soltesz of his interest in the property.

First American Bank & Trust, N.A., 2008 S.D. 83, ¶ 38, 756 N.W.2d at 31.  The second and fourth elements above prevent the entry of summary judgment, notwithstanding that defendants' intent or knowledge may be irrelevant.  See Rensch v. Riddle's Diamonds of Rapid City, 393 N.W.2d 269, 271 (SD 1986).

Here, one of the interests in property which Mr. Soltesz asserts that defendants deprived him of was his interest in the leasehold.  In order to hold that defendants are liable for conversion as a matter of law, the court would have to conclude that Mr. Soltesz's interest in the leasehold was greater than defendants' interest in the leasehold.  Which party had the greater interest in the leasehold is bound up in the issue of whether Mr. Soltesz had materially breached the lease.

The leased property clearly would revert to the landlord upon termination of the lease.  Thus, if Mr. Soltesz materially breached the lease, the leasehold would have reverted to defendants and defendants would have the greater interest in the leasehold.  Mr. Soltesz testified at his deposition that he believed the lease to have continued in effect even after the February 3, 2011, assault; while he at the same time asserts in pleadings before the court that the lease

50

terminated upon either the serving of the Notice of Trespass on February 3, or at the latest upon the Civic Center issuing its February 8 letter.  Whether one credits Mr. Soltesz's oral testimony, or his written assertions in this motion, either way there are genuine issues of material fact as to who had the greater interest in the leasehold after February 3, 2011.

And while Mr. Soltesz clearly had the greater interest in the personal property stored at the leasehold–his pizza equipment, supplies and inventory–summary judgment cannot be granted as to the conversion of this personal property because, as discussed above, there are genuine questions of material fact as to whether defendants' conduct deprived Mr. Soltesz of his interest in the property.  Mr. Soltesz states that defendants kept his personal property against his will from February until May.  Defendants assert that Mr. Soltesz rather immediately retrieved the perishable items from the leasehold and that he left his more cumbersome property at their premises for his own convenience while he was negotiating with a third party to take over the business.  The court recommends denying Mr. Soltesz's motion for partial summary judgment on defendants' liability on his claim of conversion.

## CONCLUSION

The law supports Mr. Soltesz's assertion that defendants (1) breached their contract with him, (2) effected a "seizure" of his property within the meaning of the Fourth Amendment, and (3) deprived him of a property interest

51

protected by the Fourteenth Amendment Due Process Clause. But he is not entitled to summary judgment holding that defendants are liable on each of these claims. As to each claim, there is more to the analysis. On the breach of contract claim, there remain questions as to whether Mr. Soltesz breached the lease and whether that breach is material. On the Fourth and Fourteenth Amendment claims, the question remains whether the balance of Mr. Soltesz's interests are outweighed by the government's interests, whether the governmental action was pursuant to official authority, and the timing of a post-deprivation remedy. These remaining unanswered questions prohibit a conclusion that defendants are liable as a matter of law. Accordingly, the court

RECOMMENDS denying in its entirety Mr. Soltesz's motion for partial summary judgment [Docket No. 13].

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1)(B), unless an extension of time for good cause is obtained. See also Fed. R. Civ. P. 72(b)(2). Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to

require *de novo* review by the district court.  See Thompson v. Nix, 897 F.2d

356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

      Dated February 6, 2012

                BY THE COURT:

                /s/ *Veronica L. Duffy*

                VERONICA L. DUFFY
                UNITED STATES MAGISTRATE JUDGE